Filed 8/17/20

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| MARTIS CAMP COMMUNITY ASSOCIATION, | C087759 |
| Plaintiff and Appellant, | (Super. Ct. No. SCV-0038483) |
| v. | |
| COUNTY OF PLACER et al., | |
| Defendants and Respondents; | |
| RETREAT AT NORTHSTAR ASSOCIATION et al., | |
| Real Parties in Interest and Respondents. | |
| PLACER COUNTY TAXPAYERS FOR SAFETY, ENVIRONMENTAL QUALITY, AND CONTINUED ACCESS TO PUBLIC ROADS et al., | C087778 |
| Plaintiffs and Appellants, | (Super. Ct. No. SCV-0038045) |
| v. | |
| COUNTY OF PLACER et al., | |
| Defendants and Respondents; | |
| RETREAT AT NORTHSTAR ASSOCIATION et al., | |
| Real Parties in Interest and Respondents. | |

1

APPEAL from a judgment of the Superior Court of Placer County, Charles D. Wachob, Judge.  Affirmed in part and reversed in part.

Coblentz Patch Duffy & Bass, Harry O'Brien, Naomi Rustomjee, Scott C. Hall, and Mark L. Hejinian for Plaintiff and Appellant Martis Camp Community Association.

Allen Matkins Leck Gamble Mallory & Natsis, Robert R. Moore, David H. Blackwell, and Michael J. Betz for Plaintiffs and Appellants Placer County Taxpayers for Safety, Environmental Quality, and Continued Access to Public Roads, Seth B. Taube, Ted Ullyot, and Steve Anderson.

Office of the Placer County Counsel and Clayton T. Cook for Defendants and Respondents.

Weintraub Tobin Chediak Coleman Grodin, Louis A. Gonzalez, Jr., Brendan J. Begley, Zack Thompson; Hefner Stark & Marois, Timothy D. Taron, Chad E. Roberts; Remy Moose Manley, Whitman F. Manley, and Nathan O. George for Real Parties in Interest and Respondents.


At issue in this consolidated appeal is a decision by defendant County of Placer to partially abandon public easement rights in Mill Site Road, a road that connected two adjacent residential subdivisions:  Martis Camp (previously known as Siller Ranch) and the Retreat at Northstar (the Retreat).  As originally planned, the connection between Martis Camp and the Retreat was intended for emergency access and public transit vehicles only.  When the developments were approved in 2005, the environmental documents assumed there would be no private vehicle trips between Martis Camp and the Retreat or the Northstar community beyond; Martis Camp residents wishing to drive to Northstar-at-Tahoe (Northstar) would use State Route (SR) 267.  However, sometime in or around 2010, residents of Martis Camp began using the emergency/transit connection as a shortcut to Northstar.

In 2014, after efforts to have county officials stop Martis Camp residents from using the emergency access road failed, the Retreat owners filed an application requesting that the County Board of Supervisors (the Board) abandon the public's right to

use Mill Site Road. In 2015, the Board approved a partial abandonment, thereby restricting use of Mill Site Road to Retreat property owners and emergency and transit vehicles, consistent with what was described and analyzed in the prior planning documents. These lawsuits followed.

The plaintiffs and appellants in this appeal are the Martis Camp Community Association (MCCA), a separate unincorporated association representing the interests of Martis Camp property owners, and three individual Martis Camp property owners (collectively, plaintiffs). Plaintiffs appeal the denial of their petitions for writ of mandate challenging the County's abandonment of Mill Site Road, as well as the dismissal (on demurrer) of the Martis Camp Homeowners'[1] inverse condemnation claim.[2] Plaintiffs are opposed by the County and its Board of Supervisors (collectively, the County), as defendants, and by the Retreat property owners and their homeowners association (collectively, the Retreat Homeowners), as the real parties in interest.[3]

On appeal, plaintiffs first argue the trial court erred in concluding there was no violation of the Ralph M. Brown Act (Gov. Code, § 54950 et seq.) (the Brown Act) where the County approved changes to the conditions of approval for the Martis Camp or Retreat projects without a properly noticed meeting. Second, they argue that the trial court erroneously denied the petitions because the County violated the statutory requirements for abandonment of a public road. Third, they assert the trial court

---

[1]     For clarity, we use the term "Martis Camp Homeowners" to refer to the unincorporated association and the three individual Martis Camp lot owners. The Martis Camp Homeowners also purport to represent taxpayers.

[2]     On request of the parties, we ordered that the two appeals (C087759 and C087778) be consolidated and considered together based on the augmented appellate record in case No. C087759.

[3]     The County and the Retreat Homeowners are referred to collectively as defendants.

erroneously denied the petitions because the County violated the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.; Cal. Code Regs., tit. 14, § 15000 et seq.)[4] when approving the abandonment. Fourth, plaintiffs contend the court improperly sustained a demurrer to the Martis Camp Homeowners' inverse condemnation claim.

We affirm the portion of the judgment and order concluding that the County did not violate the Brown Act or the statutory requirements for abandonment of a public road, and affirm the dismissal of the Martis Camp Homeowners' inverse condemnation claim, but reverse and remand as to plaintiffs' CEQA claim.

FACTUAL AND PROCEDURAL BACKGROUND

*The Martis Camp and Retreat projects and the emergency access connection*

Martis Camp is a private, gated community near Lake Tahoe that includes over 650 lots on nearly 2,200 acres. All of the roads in Martis Camp are private. The main roadway through the project is Schaffer Mill Road (formerly known as Siller Ranch Road), which begins at SR 267 and traverses the entire length of the community before terminating near the eastern boundary of Martis Camp.

Located immediately to the east of Martis Camp is the Retreat, a small residential subdivision within the larger Northstar development. The Retreat consists of 18 custom homesite lots on approximately 31 acres. Vehicles access the Retreat via Mill Site Road, which begins at or near the property's western boundary, passes through the subdivision, and then connects with public roads serving Northstar village and other developments to the east.

---

[4] Undesignated statutory references are to the Public Resources Code. All references to the CEQA regulations are to the CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.).

An emergency access road at the eastern edge of the Martis Camp property connects Schaffer Mill Road, the private road that runs through Martis Camp, with Mill Site Road, the (previously public) road that runs through the Retreat.

The decision to link Schaffer Mill Road and Mill Site Road via an emergency access connection can be traced back to the Martis Valley Community Plan (MVCP), the community plan adopted in 2003 to guide development within the Martis Valley area.  In preparing the MVCP, County staff recommended a roadway network that would include a "through connection between Schaffer Mill Road and Northstar Drive."  However, based on input from the community, the Board ultimately rejected this proposal.  As adopted, the MVCP provides that the connection between Schaffer Mill Road and Northstar will not be open to public traffic and shall include "*transit and emergency access only*."  (Italics added.)

Consistent with the MVCP, when the application for Martis Camp was submitted in 2002, the project description and environmental impact report (EIR) did not contemplate that private vehicles would be able to access Mill Site Road via the emergency access road.  Rather, the documents stated that access to the Martis Camp community would be provided by "one ingress/egress off" Schaffer Mill Road "near the northeast corner of the project site," and assumed that all private trips to or from Northstar would use the entrance/exit on Schaffer Mill Road and SR 267.  The documents stated that the road connection between Martis Camp and Northstar would be used only for emergency access and local public transit.  The transportation/circulation element of the EIR expressly stated that Martis Camp "residents wishing to go skiing at Northstar-at-Tahoe would need to *access Northstar via SR 267*."  (Italics added.)

In response to public concerns about the potential for the emergency access link to become a "full access roadway," the final EIR stated that the roadway would be approved for "transit/emergency access only (consistent with the adopted [MVCP])," and that any

5

future decision to open the roadway would be a "separate project subject to its own environmental review process."

In January 2005, the County certified the final Martis Camp EIR and approved the project. The approved project conditions required construction of an emergency access road connecting to the adjacent Northstar project, which road is to be built "to the satisfaction of the serving fire districts and [County Department of Public Works]." The conditions required that the emergency access road be "designed and gated to meet District, County, and State standards," and include a "Knox box system, or equivalent" to provide access to the fire district. The conditions also required the developer to provide easements allowing use of Schaffer Mill Road and the adjoining emergency access road for transit/emergency purposes.

In February 2005, shortly after approving the Martis Camp project, the County approved the Retreat project. Like the Martis Camp EIR, the Retreat's EIR did not anticipate any private vehicle trips to/from Martis Camp over Mill Site Road. The Retreat EIR assumed the connection between the Retreat and Martis Camp would be used only for emergency access and public transit vehicles.

Because the roadway would be open only to transit through traffic, the EIR's transportation study concluded that traffic levels would "remain relatively low," resulting in only a "slight[] increase" in traffic volumes. The only private vehicle trips assigned to Mill Site Road were trips to/from the 18 lots within the Retreat subdivision. Based in part on this assumption, the County allowed nine driveway encroachments onto Mill Site Road and allowed a proposed ski trail to tie into Mill Site Road within the Retreat subdivision.

The Retreat's approved project conditions require the developer/owner to (1) extend Mill Site Road to the west property line "for a future emergency access/transit access road connection;" (2) dedicate an emergency access easement across Mill Site

6

Road to the west property line; and (3) notify future lot owners in the Retreat about the "emergency access and transit corridor" along Mill Site Road.

The approved conditions required the dedication of a public road easement along Mill Site Road. The conditions also required the developer to create (or join) a county services area zone of benefit to fund maintenance and snow removal services for that road. To ensure compliance with Proposition 218,[5] an engineer's report was prepared stating that the services to be provided represent a "<u>special benefit</u>" to the Retreat owners in that "the services to be funded by the assessments will <u>only</u> benefit the Retreat Subdivision property and the individual lots" therein. (Original underscoring.)

Following approval of the Retreat project, the developer constructed Mill Site Road. In accordance with the project's improvement plans, the road was constructed to a "rural minor standard" of 22 feet in width.[6] This standard is typically used for roads serving relatively small numbers of lots (i.e., up to 50 units on a cul-de-sac or up to 75 units on a through road). Big Springs Drive, to which Mill Site Road connects, is a "more standard" 32-foot-wide roadway.

On May 9, 2006, zone of benefit No. 187 for county service area No. 28 was created by County Resolution 2006-107. As a result, the Retreat property owners were subject to special assessments to fund maintenance and snow removal services for Mill Site Road.

On May 16, 2006, the Retreat irrevocably offered to dedicate a public road easement over Mill Site Road, as shown on the recorded map. The County formally

---

[5]    Proposition 218, the Right to Vote on Taxes Act, adopted by voters, General Election (Nov. 6, 1996), added articles XIII C and XIII D to the California Constitution.

[6]    The County generally requires rural roads to be at least 32 feet wide if the roads will service at least 75 units.

accepted Mill Site Road into the county network of public roads in December 2008. (Sts. & Hy. Code, § 941, subd. (c); *Mikels v. Rager* (1991) 232 Cal.App.3d 334, 353-354.)

*2007 addendum to Martis Camp EIR*

In December 2007, the Martis Camp developer prepared an addendum to the 2004 Martis Camp EIR in connection with the "Lookout Martis" project to provide a ski lift connection between Martis Camp and Northstar's ski facilities. The addendum considered the project's potential impacts on area roadways. Consistent with the 2004 Martis Camp EIR, the 2007 addendum assumed that private vehicles from Martis Camp would not access Northstar via Mill Site Road. Accordingly, the addendum concluded that the ability of Martis Camp residents to access Northstar ski facilities from within the Martis Camp community would result in a "slight reduction in projected traffic volumes *along SR 267 and Northstar Drive . . . .*" (Italics added.)

*Martis Camp residents' use of Mill Site Road*

The improvement plans for the Martis Camp emergency access road originally called for installation of two gates, one near the boundary where the road connects to the Retreat property and another where Schaffer Mill Road connects to the emergency access road. The plans also required traffic signs indicating that the road was restricted to emergency vehicles only.

Sometime between 2005 and 2006, a manual emergency access gate was erected at the western terminus of Mill Site Road.

In or about 2010, the manual gate was removed and the Martis Camp developer installed an electronic emergency access gate at the eastern terminus of Schaffer Mill Road that could be controlled with a transponder. In addition, road signs were installed (on the Retreat side of the gate) stating that the road was for "EMERGENCY VEHICLE ACCESS ONLY." The Martis Camp developer then began issuing transponders to Martis Camp property owners, allowing them to open the gate and access Mill Site Road at will. The Martis Camp developer later removed the "EMERGENCY VEHICLE

8

ACCESS ONLY" sign and replaced it with a new sign stating: "PRIVATE ROAD, Transponder Access Only." Shortly thereafter, Retreat Homeowners witnessed private vehicles from Martis Camp using the emergency connection to access Mill Site Road, resulting in significantly increased traffic passing through the Retreat subdivision.

In 2011 and 2012, Retreat Homeowners objected to Martis Camp residents' use of Mill Site Road. They argued that (1) both the Retreat and Martis Camp subdivisions were approved based on the assumption that the road connection would be used only for transit/emergency purposes; (2) any other use would require additional environmental review and County approval; and (3) the Martis Camp developer never applied for or received permission to use the road for other purposes. The Retreat Homeowners requested the County take action to stop Martis Camp residents from using the emergency access road to access Mill Site Road.

The director of the County's Community Development Resource Agency (CDRA) responded to the Retreat Homeowners' objections by letters dated December 12, 2011, and November 1, 2012. In the letters, the director informed the Retreat Homeowners that county staff had investigated the issues and concluded that no code enforcement action was warranted. The director of the CDRA concluded that Martis Camp residents had rights to use Mill Site Road as owners of property abutting a public roadway. The director denied that use of Mill Site Road was limited to emergency vehicle and public transit access because he was unaware of any language in the conditions of approval expressly prohibiting use of Mill Site Road for other purposes.

*Previous litigation over Martis Camp access to Mill Site Road*

In 2013, an association of parties affiliated with Retreat property owners filed a petition for writ of mandate and complaint seeking an order requiring the County to prohibit Martis Camp residents from using the emergency connection to reach Mill Site Road. (See *Tahoe Residents United for Safe Transit v. County of Placer* (Feb. 28, 2020, C075933) [nonpub. opn.] (*Tahoe Residents*).) The petition and complaint alleged that the

9

County, by allowing Martis Camp residents to access Mill Site Road, converted the emergency connection into a new entrance/exit for the Martis Camp community.[7]  It alleged that this conversion violated the project conditions of approval, CEQA, the Brown Act, the Planning and Zoning Law (Gov. Code, §§ 65000 et seq.), the Subdivision Map Act (Gov. Code, §§ 66410 et seq.), nuisance laws, and Business and Professions Code section 17200.

Defendants demurred to the petition and complaint, arguing that the claims were time-barred and failed to state a cause of action.  They also argued that there was no illegal conversion or unauthorized use of Mill Site Road because Martis Camp residents have abutter's rights to use the road, and nothing in the planning documents or project approvals prohibits such use.  Further, because their use arose from abutter's rights, and not from any discretionary County approval, defendants argued there was no "project" triggering additional CEQA review.

The trial court agreed with defendants that the petition and complaint failed to state sufficient facts for mandamus relief and sustained the demurrers as to all causes of action against the County.  The plaintiffs then voluntarily dismissed their remaining claims for nuisance and violation of Business and Professions Code section 17200 and the court entered a judgment of dismissal as to the petition and complaint.  (*Tahoe Residents, supra*, C075933.)

The trial court's ruling was appealed and, in a separate appeal, we reversed.[8] (*Tahoe Residents, supra*, C075933.)  Although we agreed that the CDRA's November 1,

---

[7]    The petition and complaint focused on the November 1, 2012 letter from CDRA denying that Martis Camp residents' use of Mill Site Road was unlawful.

[8]    The County argued on appeal that nothing in the planning documents or project approvals prohibited Martis Camp residents from accessing Mill Site Road and that Martis Camp residents had lawful access to Mill Site Road pursuant to abutter's rights resulting from the dedication of Mill Site Road as a public road.  The County is not

10

2012 letter did not constitute a CEQA "project," we held the allegation that the County permitted Martis Camp residents to use the emergency access road constituted a substantial change in both the Martis Camp and Retreat projects (or the surrounding circumstances) because the EIR and project conditions of approval (and the MVCP) did not contemplate nontransit/nonemergency use of the connection by Martis Camp residents. (*Tahoe Residents, supra*, C075933.) Thus, we held plaintiffs sufficiently pleaded a CEQA violation based on the County's failure to prepare a subsequent or supplemental EIR before permitting such use. (*Tahoe Residents, supra*, C075933.) We affirmed dismissal of the complaint, but reversed as to the petition for writ of mandate, and remanded for further proceedings on the CEQA claim. (*Tahoe Residents, supra*, C075933.)

*The abandonment request*

In February 2014, the Retreat Homeowners filed an application requesting the County abandon the public road easement rights in Mill Site Road (and Cross Cut Court),[9] and dissolve the associated county service area zone of benefit established for maintenance of those roads. The Retreat Homeowners sought to preclude Martis Camp residents from using Mill Site Road as a second point of ingress/egress to Martis Camp.

The Board considered the abandonment request for the first time on December 9, 2014. Staff presented two options: (1) deny the request, or (2) continue the matter to a future meeting for further consideration of the abandonment request. At the hearing, the Board received comments in favor of the abandonment request from representatives of the Retreat and Northstar communities, and against it from representatives of the Martis

---

judicially estopped from taking an inconsistent position here because its position was not successful on appeal. (*Aguilar v. Lerner* (2004) 32 Cal.4th 974, 986.)

[9]     Cross Cut Court is a cul-de-sac providing access to the Retreat's interior lots. Its abandonment is not challenged by plaintiffs.

Camp community. The Retreat Homeowners argued that Martis Camp residents' use of Mill Site Road was an unintended and unsafe use that was not analyzed in prior environmental documents. They also argued it was unfair to permit Martis Camp residents to use Mill Site Road when the Retreat Homeowners are responsible for the costs of maintaining that road.[10]

Opponents argued that Martis Camp property owners had a right to access Mill Site Road as a public road abutting their property. They also argued that Mill Site Road was being used by Martis Camp residents as a convenient and environmentally friendly connection to Northstar, and therefore it would be inappropriate to abandon the road as "unnecessary."

County staff recommended that the request to abandon Mill Site Road be denied. The Board, however, voted unanimously to continue the matter for further consideration of the abandonment request.

The abandonment request next came before the Board on August 4, 2015. The Board received further public comment, and heard from persons affiliated with the Retreat and Martis Camp projects, as well as from staff. At the end of the hearing, the Board voted to tentatively approve the abandonment request.

The Board took final action on the abandonment request on November 3, 2015. After receiving additional comments from the Retreat and Martis Camp parties, the Board voted unanimously to approve the requested abandonment. The approval was conditioned upon (1) approval of an addendum to the Martis Camp EIR; (2) execution of an indemnity agreement between the County and the Retreat; (3) the grant of a conditional irrevocable offer of dedication for public road easements across Mill Site

---

**10**     According to the MCCA, approximately 100 to 250 private vehicles were using the gate on any given day. At full build-out of Martis Camp, it was estimated that these daily usage figures could triple.

Road (and Cross Cut Court), which could be accepted if the Retreat materially breached its obligations under the indemnity agreement or failed to adequately maintain Mill Site Road; (4) reservations of easements for public transit, public utility services, emergency access, and a multipurpose public trail; and (5) reservation of a private road easement for the benefit of the Retreat property owners.

On November 3, 2015, the Board adopted Resolution No. 2015-231, approving an addendum to the Martis Camp EIR (addendum); Resolution No. 2015-232, adopting findings of fact; and Resolution No. 2015-233, abandoning the public road easements for Mill Site Road and Cross Cut Court, subject to conditions and reservations (collectively, the Resolutions).

In support of the Resolutions, the Board found that the roads were unnecessary for present or prospective public use, and that abandonment was in the public interest. The Board found that use of Mill Site Road by Martis Camp residents was not necessary for general public travel because such use was never intended to be part of the Martis Valley roadway network. The Board found that none of the environmental documents for the MVCP, Martis Camp project, Retreat project, or the Lookout Martis project assumed that private vehicles would use the roadway connection between Martis Camp and the Retreat. The Board expressly overruled the prior determination by the CDRA director that use of Mill Site Road by Martis Camp residents was consistent with the conditions of approval for that project.

The Board also found that the public interest would be served by the proposed abandonment because (1) the County has a substantial interest in ensuring that (a) the existing roadway network matches what was analyzed and presented to the public, (b) its roads are used consistently with the standards to which they were designed, and (c) the public is presented with accurate planning information; (2) the County would be relieved of the burden of maintenance; (3) abandonment is consistent with the County's general plan and the MVCP; (4) the County has an interest in protecting the integrity and

13

successful operation of the Northstar Traffic Management System; (5) abandonment will help maintain traffic flow on Northstar Drive and improve circulation within the Northstar community; and (6) a public easement over Mill Site Road will be reserved for use by local public transit.

The notice of determination for the County's CEQA determination was filed with the county clerk on November 6, 2015. Resolution No. 2015-233, abandoning Mill Site Road, was recorded by the county on November 22, 2016. The Martis Camp Homeowners timely filed a petition for writ of mandate challenging the County's Resolutions. A related petition was filed by MCCA.

The petitions alleged that the County ignored and violated the statutory standards for abandoning Mill Site Road; violated CEQA; and improperly modified the Martis Camp project's conditions of approval without proper notice, comment, or hearing. The petitions sought, among other relief, a writ of mandate directing the County to set aside the Resolutions approving the abandonment.

The Martis Camp Homeowners and MCCA subsequently filed amended petitions adding causes of action for inverse condemnation and related declaratory relief. The petitions ultimately were consolidated for purposes of submission of the administrative record, briefings, and hearings.

In October 2017, the trial court sustained without leave to amend a demurrer to the Martis Camp Homeowners' fourth cause of action for inverse condemnation. The court concluded that the Martis Camp Homeowners could not claim abutter's rights with respect to Mill Site Road because they did not allege they owned lots abutting Mill Site Road. The court rejected the argument that the Martis Camp Homeowners could claim abutter's rights based on a nonexclusive easement granted to Martis Camp property owners for ingress and egress over all of Martis Camp's private roads.

The trial court overruled a demurrer to MCCA's inverse condemnation and related declaratory relief claims because, unlike the Martis Camp Homeowners, MCCA had

14

alleged that it owned property directly abutting Mill Site Road. The trial court subsequently bifurcated MCCA's inverse condemnation claim and related declaratory relief claim from the writ claims.

The writ claims were heard in June 2018. In separate orders issued on June 28, 2018, the trial court denied both writ petitions. Judgment was entered in the Martis Camp Homeowners lawsuit (SCV-0038045) on August 6, 2018. The Martis Camp Homeowners filed a notice of appeal from that judgment on August 14, 2018.

MCCA filed a notice of appeal from the trial court's order denying its writ petition on August 2, 2018. On November 5, 2018, the trial court issued a judgment against MCCA on the writ petition claims (SCV-0038483). The trial court's judgment notes that MCCA's inverse condemnation and declaratory relief causes of action are still pending.

## DISCUSSION

### I

### *Appealability*

As a threshold issue, we consider defendants' claim that MCCA's appeal must be dismissed because the underlying order or judgment is not yet final under the "one final judgment" rule.

An appealable judgment is a jurisdictional prerequisite to an appeal. (*Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 696.) Under the "one final judgment" rule, an order or judgment that fails to dispose of all claims between the litigants is not appealable. (Code Civ. Proc., § 904.1, subd. (a); *Sullivan v. Delta Air Lines, Inc.* (1997) 15 Cal.4th 288, 307.) The rule precludes appeal of an order granting or denying a writ of mandate if other causes of action remain pending between the parties, even if the causes disposed of by the judgment were tried separately or may be characterized as "separate and independent" from those remaining. (*Griset, supra*, 25 Cal.4th at pp. 696-697; *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 743; *Nerhan v. Stinson Beach County Water Dist.* (1994) 27 Cal.App.4th 536, 540.)

15

Here, MCCA appealed from the June 28, 2018 order denying its petition for writ of mandate.[11] However, that order did not dispose of MCCA's inverse condemnation and declaratory relief claims against the County. Defendants argue that because the order did not dispose of all the claims between MCCA and the County, the order is not appealable.

We conclude that MCCA's appeal should not be dismissed. In multiparty actions, a judgment disposing of all the issues as to one party is appealable even if issues remain as to other parties. (*Ram v. OneWest Bank, FSB* (2015) 234 Cal.App.4th 1, 9; *Estate of Gonzalez* (1990) 219 Cal.App.3d 1598, 1601.) This is a multiparty lawsuit and the trial court's order completely disposed of all MCCA's claims against the Retreat. Thus, we conclude the order is appealable, even if unresolved issues remain between MCCA and the County.[12]

## II

### *Brown Act Violation*

Plaintiffs argue that the County violated the Brown Act (Gov. Code, § 54950 et seq.) by fundamentally altering conditions of approval for the Retreat or Martis Camp projects without prior notice to the public. We disagree.

---

[11] On November 5, 2018, the trial court issued a final judgment in favor of the Retreat and against MCCA "as to all claims" between MCCA and the Retreat. The subsequent judgment does not affect the appealability of the order. (*Public Defenders' Organization v. County of Riverside* (2003) 106 Cal.App.4th 1403, 1409 [order denying petition for writ of mandamus is appealable]; *Dana Point Safe Harbor Collective v. Superior Court* (2010) 51 Cal.4th 1, 5 [it is not the form but the substance and effect of the adjudication which is determinative].)

[12] We recognize that the trial court considered the abutter's rights claim in the limited context of deciding what standard of review should apply. However, it does not appear the parties fully litigated the abutter's rights issue. Accordingly, we do not construe the trial court's order as disposing of the entire case against the County.

A. *Additional background*

The Legislature enacted the Brown Act with the objective of facilitating public participation in local government decisions and curbing misuse of the democratic process by secret legislation. (*Boyle v. City of Redondo Beach* (1999) 70 Cal.App.4th 1109, 1116.) To these ends, the Brown Act generally requires that all meetings of a local legislative body be open and public. (Gov. Code, § 54953, subd. (a).)

The Brown Act mandates that the public receive adequate notice of every item to be discussed at a meeting. (Gov. Code, § 54954.2, subd. (a)(1).) Before any regular meeting, a local agency must post an agenda specifying the time and location of the meeting and briefly describing (generally in 20 words or less) "each item of business to be transacted or discussed at the meeting . . . ." (*Ibid*.) The agenda must be posted, in a location that is freely accessible to the public, at least 72 hours before the meeting. (Gov. Code, §§ 54954, subd. (a), 54954.2, subd. (a)(1).) With limited exceptions not relevant here, the Brown Act forbids action or discussion on any item not appearing on the posted agenda. (Gov. Code, § 54954.2, subd. (b); *Preven v. City of Los Angeles* (2019) 32 Cal.App.5th 925, 931.)

The publicly posted agenda for the Board's August 4, 2015 meeting listed four items relating to the abandonment of Mill Site Road and Cross Cut Court: "1. Consider an Addendum to the [Martis Camp EIR] and adopt a Resolution approving same[.] [¶] 2. Consider adoption of a Resolution adopting findings and statements of fact relating to the proposed abandonment of the public road easement rights to Mill Site Road and Cross Cut Court within the Retreat at Northstar Subdivision. [¶] 3. Consider adoption of a Resolution to abandon the public road easement rights to Mill Site Road and Cross Cut Court within the Retreat at Northstar Subdivision under the terms of the Conditions of Abandonment, and the reservation of Drainage, Snow Storage, Slope and Transit Easements, and an Irrevocable Offer of Dedication. [¶] 4. Approve an Indemnity Agreement between the County of Placer and the Retreat at Northstar Association."

17

The Board ultimately approved the proposed abandonment.  In support of its decision, it found that private vehicle use of the emergency access road is inconsistent with the conditions of approval for the Martis Camp project.

Before the trial court, plaintiffs argued the Board violated the Brown Act by approving changes to the Martis Camp and/or Retreat project conditions without a properly noticed meeting.  The trial court found no Brown Act violation.  The court ruled that plaintiffs failed to establish that the act of overruling the CDRA director's prior enforcement decisions was a " 'distinct item of business' " that needed to be included on the agenda, as opposed to a "mere component of project approval."

B.      *Analysis*

The issue on appeal is whether the Board's actions violated the notice/agenda requirements of the Brown Act.  This presents a legal question subject to our independent review.  (*San Joaquin Raptor Rescue Center v. County of Merced* (2013) 216 Cal.App.4th 1167, 1175-1179; *Furtado v. Sierra Community College* (1998) 68 Cal.App.4th 876, 880; see also *Drum v. Fresno County Dept. of Public Works* (1983) 144 Cal.App.3d 777, 783-784, fn. 2 [construction of local government resolutions is governed by rules governing construction of statutes].)

Plaintiffs contend that the CDRA director's enforcement decisions in 2011 and 2012 established that the project conditions of approval do not prohibit Martis Camp residents from using Mill Site Road as a means of ingress/egress.  They argue that by overruling the director's prior enforcement decisions, the Board changed the conditions of approval.  And because the public agenda did not provide notice that those conditions would be changed, the Board's actions allegedly violated the Brown Act.

Plaintiffs' argument rests on the premise that the CDRA director correctly determined that Martis Camp residents' use of the emergency access road did not violate

18

the conditions of approval.[13]  We conclude, as did the trial court, that the premise of plaintiffs' argument is incorrect.[14]

To interpret the conditions of approval, we look first to the plain language of the conditions for the Martis Camp project.  (See *Moyer v. Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230.)  Relevant here, condition No. 39 explicitly requires construction of an "emergency access connection . . . to provide a connection to the adjacent Northstar project to the satisfaction of the serving fire districts and the [Department of Public Works]."  Contrary to what plaintiffs argue, an emergency access connection is not just another road.  As indicated in the project documents, and as the name implies, an emergency access connection is a road with a specifically designated purpose, which is to provide access to/from the community during an emergency.[15]

Plaintiffs argue the condition was intended to ensure the County could use the road for emergency (and transit) uses, but was not intended to preclude Martis Camp residents from using the road for other purposes.  We disagree.  If the intent merely were

---

[13]    The Board was not bound by the CDRA director's prior enforcement decisions (*1041 20th Street, LLC v. Santa Monica Rent Control Bd.* (2019) 38 Cal.App.5th 27, 44-45; *Citizens for Improved Sorrento Access, Inc. v. City of San Diego* (2004) 118 Cal.App.4th 808, 819 (*Sorrento*)), and neither are we.

[14]    Plaintiffs also challenge the trial court's ruling that the Board did not alter the conditions of approval for the Retreat, arguing that the abandonment itself altered the condition of approval requiring Mill Site Road to be dedicated as a public road. However, plaintiffs fail to explain how this establishes a violation of the Brown Act's notice requirements.  The meeting agendas clearly gave notice that the Board would consider the proposed abandonment of Mill Site Road.  To the extent the abandonment altered the condition requiring Mill Site Road to be dedicated as a public road, we conclude the change was a component of the project approval, and not a distinct item of business that needed to be separately agendized.  (*Olson v. Hornbrook Community Services Dist.* (2019) 33 Cal.App.5th 502, 526.)

[15]    By virtue of another condition, the County also had the right to use the "emergency connection to Northstar-at-Tahoe" for "[l]ocal transit services."

to require a nonexclusive emergency access easement, the County clearly knew how to draft such a condition, as it did in condition Nos. 33 and 55(M), requiring the project applicant to provide easements for emergency access and local public transit. Indeed, condition No. 55(M) expressly distinguishes between emergency access easements and emergency access roads.

If there were any lingering doubts about the meaning of the project conditions, they are dispelled by condition No. 44, which addresses road paving requirements. It states, in relevant part: "*In areas where routine traffic is not anticipated[,] such as emergency access roads*, the paving requirement may be reduced . . . ." (Italics added.) This condition makes clear that the emergency access road was not intended to serve routine traffic traveling to/from the community.

We also consider the context in which the conditions of approval were adopted. (*Alford v. Pierno* (1972) 27 Cal.App.3d 682, 688; *Baldwin v. City of Los Angeles* (1999) 70 Cal.App.4th 819, 838.) In approving the project, the County found the project to be consistent with the governing community plan (the MVCP). (Gov. Code, §§ 65455, 65458; *Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 782 [project must be consistent with governing land use plan].) That plan specifically provides that the road connection between Martis Camp and the Retreat shall be limited to "transit and emergency access only . . . ." Consistent with the MVCP, when the Martis Camp project was proposed, its application stated it would connect to Northstar "for emergency access only."

The Martis Camp EIR likewise assumed that the roadway connecting Martis Camp to Northstar would be "transit/emergency access only." It assumed that all private vehicle trips to and from Martis Camp would use the main entrance/exit on Schaffer Mill Road "near the northeast corner of the project site." The EIR did not contemplate that

20

private vehicles would use the emergency access road for access to/from Martis Camp.[16] The EIR expressly stated that any future decision to open the emergency access road for anything other than emergency and transit use would be a separate project subject to its own environmental review. Construed in this context, we have little difficulty concluding that the project conditions did not contemplate Martis Camp residents using the emergency access road as a means of ingress to and egress from the community.

Because the conditions of approval always limited use of the emergency access road to emergency/transit uses, we agree with the trial court's conclusion that the act of formally overruling the CDRA director's prior enforcement letters was not a "distinct item of business" that needed to be included on the agenda.[17] Accordingly, we affirm the trial court's denial of plaintiffs' Brown Act claims.

III

*Abandonment of Mill Site Road*

Plaintiffs also claim that the County's decision violated the statutory requirements for abandonment of a public road. We disagree.

---

[16] We are unpersuaded by plaintiffs' argument that the reason the environmental documents did not analyze the impacts of such use was because Mill Site Road had not yet been accepted into the public roadway network. Such an approach would violate CEQA, which requires an EIR to discuss the environmental effects a proposed project is *likely to have*, by itself, or when added to other reasonably foreseeable projects. (See §§ 21002.1, 21061; CEQA Guidelines, §§ 15130, 15355, subd. (b); *City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 905.) We conclude that the lack of analysis of use by Martis Camp residents of the emergency access connection as a shortcut to/from Northstar is evidence that the connection was not expected to be used in that manner.

[17] Even where a plaintiff has satisfied the threshold procedural requirements, a Brown Act violation will not automatically invalidate the action taken by the legislative body. (*Olson v. Hornbrook Community Services Dist., supra*, 33 Cal.App.5th at p. 517.) The plaintiff must show that the violation caused prejudice. (*Ibid.*) Here, plaintiffs have not even attempted to show how they were prejudiced by the Board's alleged violations.

21

A. *Additional background*

California Streets and Highways Code section 8300 et seq. governs the procedure to abandon (or vacate) a public road. These statutes authorize a county to "vacate . . . all or part of a street, highway, or public service easement" within its jurisdiction. (Sts. & Hy. Code, § 8312.) The term " 'vacation' " is defined to mean a "complete or partial abandonment or termination of the public right to use a street, highway, or public service easement." (Sts. & Hy. Code, § 8309.)

To abandon a public road, the legislative body must find, after a hearing, that the road is "unnecessary for present or prospective public use." (Sts. & Hy. Code, § 8324, subd. (b).) In addition, the abandonment must be "in the public interest." (*Heist v. County of Colusa* (1984) 163 Cal.App.3d 841, 849 (*Heist*).)

A resolution of vacation may provide that abandonment shall occur only after conditions required by the legislative body have been satisfied. (Sts. & Hy. Code, § 8324, subd. (b).) The statutes also provide for the reservation and preservation of easements by the county and other public entities. (Sts. & Hy. Code, §§ 8340-8349.)

In this case, the Retreat Homeowners filed an application requesting abandonment of the public road easement rights to Mill Site Road (and Cross Cut Court). After a series of hearings, the Board voted unanimously to adopt a resolution approving the requested abandonment. As part of the Resolutions, the Board adopted findings that the roads at issue were unnecessary for present or prospective public use and that abandonment was in the public interest. Plaintiffs challenge the Board's actions.

B. *Standard of review*

On appeal in mandate actions, the trial court and appellate court perform the same function. (*McGill v. Regents of University of California* (1996) 44 Cal.App.4th 1776, 1786; *American Board of Cosmetic Surgery v. Medical Board of California* (2008) 162 Cal.App.4th 534, 548.) We review the agency's action, not the trial court's decision.

22

(*Mount Shasta Bioregional Ecology Center v. County of Siskiyou* (2012) 210 Cal.App.4th 184, 195.)

Statutes provide for two types of mandate review: ordinary mandate and administrative mandate. (Code Civ. Proc., §§ 1085, 1094.5.) The nature of the administrative action or decision at issue determines which type of review applies. (*Bunnett v. Regents of University of California* (1995) 35 Cal.App.4th 843, 848 (*Bunnett*).) In general, administrative mandate under Code of Civil Procedure section 1094.5 is used to review the validity of quasi-judicial decisions resulting from a proceeding in which (1) a hearing was required to be given, (2) evidence was required to be taken, and (3) discretion in the determination of facts was vested in the agency. (*Bunnett, supra*, at p. 848.) In administrative mandate cases, abuse of discretion is established if the agency has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by substantial evidence in light of the whole record.[18] (Code Civ. Proc., § 1094.5, subds. (b), (c).)

Ordinary mandate under Code of Civil Procedure section 1085 is used to review ministerial acts, quasi-legislative acts, and quasi-judicial decisions which do not meet the requirements for review under Code of Civil Procedure section 1094.5. (*Bunnett, supra*, 35 Cal.App.4th at p. 848; *Carrancho v. California Air Resources Board* (2003) 111 Cal.App.4th 1255, 1264-1265.) In such cases, the appropriate standard is whether the agency's action was arbitrary, capricious, entirely lacking in evidentiary support, or failed

---

[18] Depending on the nature of the order or decision, the court may review the sufficiency of the evidence supporting an administrative order or decision under the "independent judgment" or "substantial evidence" standard. (See *Dominey v. Department of Personnel Administration* (1988) 205 Cal.App.3d 729, 740.) The independent judgment standard applies when the administrative agency is of legislative origin and its decision affects a fundamental vested right. (*Id.* at p. 741.) There is no contention in this case that the Board's decision affected a fundamental vested right.

to follow the procedure required by law. (*Sorrento, supra*, 118 Cal.App.4th at p. 814; *Heist, supra*, 163 Cal.App.3d at p. 846.)

The parties in this case disagree about the standard by which we should review the County's action. Defendants assert that the County's decision to abandon Mill Site Road is a quasi-legislative act, subject to review by ordinary mandate under Code of Civil Procedure section 1085. Plaintiffs, on the other hand, contend that because the abandonment affected MCCA's rights as an abutting landowner,[19] the County's decision is a quasi-judicial act, subject to review for abuse of discretion under Civil Procedure Code section 1094.5.

California appellate courts are split on whether the process of vacating a street is legislative or adjudicatory. (Compare *Heist, supra*, 163 Cal.App.3d 841, with *City of Rancho Palos Verdes v. City Council* (1976) 59 Cal.App.3d 869, 876 (*Rancho Palos Verdes*) and *Ratchford v. County of Sonoma* (1972) 22 Cal.App.3d 1056, 1067

---

[19]    The trial court found the evidence insufficient to determine whether MCCA owns property abutting Mill Site Road. Plaintiffs argue that the evidence "could not be clearer" that MCCA owns the emergency access road and that the road abuts Mill Site Road. We find the evidence less than clear. Even if we assume that MCCA owns the property underlying the emergency access road (lot CCCC), the evidence conflicts on whether the emergency access road and Mill Site Road abut. On one hand, there is evidence suggesting that Mill Site Road was paved to the Retreat's western property line. On the other hand, there is evidence showing that a small, unsurveyed "remainder" parcel exists between the end of Mill Site Road and the western boundary of the Retreat property, over which there is an emergency access easement. Whether the Martis Camp emergency access road abuts Mill Site Road would seem to depend on whether the unsurveyed remainder parcel was intended to be part of the Mill Site Road offer for dedication to the public, or intended to serve as a "spite strip" to prevent Martis Camp from acquiring abutter's rights. In a December 12, 2011 letter, the director of the CDRA acknowledged the "unsurveyed remainder" issue, and further acknowledged that such property may not have been included within the county service area zone of benefit for the subdivision, but nevertheless took the position that the property is part of the public roadway. The Retreat Homeowners disagreed. We express no opinion on the merits of this issue.

(*Ratchford*).) Generally, we have held that a county's decision to abandon a street is a legislative decision. (*Heist, supra*, 163 Cal.App.3d at pp. 845-846; see also *Cramer v. County of Los Angeles* (1950) 96 Cal.App.2d 255, 256-257.) However, a distinction may exist when a party opposing abandonment has a direct property interest in the road as an abutting property owner. (*Ratchford, supra*, 22 Cal.App.3d at p. 1067; *Heist, supra*, 163 Cal.App.3d at pp. 847-848; see also *Rancho Palos Verdes, supra*, 59 Cal.App.3d at pp. 885-887 [where abandonment has mixed legislative and judicial characteristics, the dominant purpose of the action controls].)[20]

It is unnecessary for us to enter this debate as we conclude that the outcome of this appeal would be the same under either standard of review. Although the "arbitrary or capricious" standard is not synonymous with the "substantial evidence" test (*American Coatings Assn. v. South Coast Air Quality Management Dist.* (2012) 54 Cal.4th 446, 461), there are only subtle differences between them. (See *Bunnett, supra*, 35 Cal.App.4th at p. 849; *Sacramentans for Fair Planning v. City of Sacramento* (2019) 37 Cal.App.5th 698, 707 [no material difference]; *California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 637 (*Rancho Cordova*) [no practical difference]; *Balch Enterprises, Inc. v. New Haven Unified School Dist.* (1990) 219 Cal.App.3d 783, 792 [same].)

Under the arbitrary and capricious standard, the question is whether the agency's action has a reasonable basis in law and a substantial basis in fact. (*Power v. State Personnel Bd.* (1973) 35 Cal.App.3d 274, 276.) We defer to an agency's factual finding unless no reasonable person could have reached the same conclusion on the evidence before it. (*Rancho Cordova, supra*, 172 Cal.App.4th at p. 637; *Sacramentans for Fair*

---

[20] Both *Heist* and *Rancho Palos Verdes* hold that a determination of public interest in vacating a street is a legislative determination. (*Heist, supra*, 163 Cal.App.3d at p. 849; *Rancho Palos Verdes, supra*, 59 Cal.App.3d at p. 891.)

25

*Planning v. City of Sacramento, supra*, 37 Cal.App.5th at p. 707 [whether finding reasonable based on evidence in record].) Under the substantial evidence test, our review begins and ends with a determination of whether there is substantial evidence, contradicted or uncontradicted, to support the findings. (See *Department of Forestry & Fire Protection v. Howell* (2017) 18 Cal.App.5th 154, 192.) We do not reweigh the evidence and are bound to indulge all presumptions and resolve all conflicts in favor of the administrative decision. (*Amerco Real Estate Co. v. City of West Sacramento* (2014) 224 Cal.App.4th 778, 786.) Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. (*California Youth Authority v. State Personnel Bd.* (2002) 104 Cal.App.4th 575, 584.) A common formulation of the substantial evidence test asks whether a reasonable person could have reached the same conclusion on the evidence. (*Rancho Cordova*, at p. 637.)

Under the facts of this appeal, we do not find the subtle differences between the two standards to be material. Plaintiffs' challenges to the sufficiency of the evidence would fail under either standard. Thus, for simplicity, we will apply the less deferential substantial evidence standard of review.

Regardless of the standard we apply to the County's factual findings, we review questions of statutory interpretation and other questions of law de novo. (*Fry v. Saenz* (2002) 98 Cal.App.4th 256, 262.)

C.   *The finding that Mill Site Road is unnecessary for public use*

1.   *Existing use of Mill Site Road*

Plaintiffs contend the Board's finding that Mill Site Road is unnecessary for present or prospective public use is not supported by substantial evidence. Plaintiffs argue that the evidence establishes that prior to abandonment, Mill Site Road was being

used regularly and extensively by Martis Camp residents, which precludes finding the road unnecessary for public use.[21]

However, a legislative finding that a road is unnecessary cannot be defeated merely by showing that people would use the road if it were not abandoned. (*Sorrento, supra*, 118 Cal.App.4th at p. 815.) The term " 'unnecessary' connotes something that is not 'essential' or 'needed for the continuing existence or functioning of something.' " (*Ibid.*) "[I]f something is not 'needed' by the public, this condition means that it is *not required*, which is different from stating that the item is not *wanted* or *desired* by individual citizens." (*Id.* at p. 816.) The governing body may look to the "entire system of roads" in determining whether a particular road is no longer necessary or essential for traffic circulation purposes. (*Ibid.*)

In *Sorrento*, the court upheld a city's decision to abandon a closed road, despite evidence that an estimated 16,000 to 17,000 vehicles would use the road on a daily basis if it were reopened. (*Sorrento, supra*, 118 Cal.App.4th at pp. 814-816.) Because there were alternative routes providing equivalent transportation benefits, the fact that many members of the public would use the road if it were reopened did not preclude the governing body from finding that the street was unnecessary to the public transportation network. (*Id.* at pp. 814-816.)

Here, the Board found that Mill Site Road is unnecessary for the Martis Valley roadway network, but not because of the discovery of an "equivalent" alternative route. Rather, it was based on evidence showing that Mill Site Road never was intended to be part of the public transportation network.

In particular, the Board relied on evidence showing that (1) when planning the Martis Valley roadway network, the County decided the connection between Martis

---

[21]    Plaintiffs raise similar arguments regarding existing use of the road by Northstar staff and public transit vehicles. We address these arguments elsewhere in this opinion.

27

Camp and Northstar would be open to emergency and public transit vehicles only; (2) the environmental documents for the Martis Camp project assumed that Martis Camp residents traveling to Northstar would use SR 267, and not the road connection between Martis Camp and Northstar; (3) the environmental documents for the Retreat project assumed the only private vehicles using Mill Site Road would be those traveling to/from the 18 lots with the Retreat subdivision; (4) because the only private vehicle trips assigned to Mill Site Road were those to/from the 18 lots within the Retreat subdivision, the County required Mill Site Road to be built to a rural minor standard and allowed driveway encroachments and a ski trail tie-in; and (5) the success of the Northstar Traffic Management System is predicated on a single point of ingress/egress into the Northstar community. The Board also relied on the Martis Camp project conditions of approval, which, as discussed above, prohibit use of the emergency access road for private vehicle ingress/egress.

Under *Sorrento*, evidence that Martis Camp residents were using Mill Site Road as a "convenient"—albeit unauthorized—connection between Martis Camp and Northstar did not preclude the Board from finding that Mill Site Road was not a necessary part of the public transportation network. The Board found that Martis Camp residents' use of Mill Site Road was unnecessary because the public system of roads was not planned, designed, or approved to accommodate that use. The Board's findings are reasonable and supported by substantial evidence in the record.

2. *Conditions of abandonment*

The abandonment of Mill Site Road was conditioned on, among other things: (1) reservations of easements for public transit, emergency, and public utility services; (2) reservation of a private road easement for the benefit of the Retreat property owners; and (3) the grant of an irrevocable offer of dedication by which the County could take back the public road easements in Mill Site Road under certain conditions. Plaintiffs

28

contend these conditions preclude a finding that Mill Site Road is unnecessary for present or prospective public use. We disagree.

As a general proposition, the abandonment statutes expressly authorize a legislative body to place conditions on abandonment and to except from abandonment certain easements for public utility services. (Sts. & Hy. Code, §§ 8324, subd. (b), 8340, 8350.) Plaintiffs acknowledge that the Board had authority to condition the abandonment of Mill Site Road, but argue this did not give the Board authority to impose conditions that contradict the statutory requirements for abandonment. Plaintiffs contend that by reserving easements for transit/emergency access and public utility services, the County essentially concedes that Mill Site Road is necessary for some public use. Plaintiffs argue that a road is either unnecessary for public use or it is not; an agency may not abandon a road as unnecessary to the public while simultaneously reserving an easement for a more limited public use.

Plaintiffs have failed to cite any authority, and we have found none, to support the argument that reserving an easement for public transit and emergency services is prohibited under the abandonment statutes. The language of the statutes suggests a contrary conclusion. Reservation of certain public easements, such as for public utility services and public trails, is expressly permitted by the statutes. (Sts. & Hy. Code, § 8340.) A public agency also has authority to reserve an easement for a future street unless the street is found to be unnecessary for prospective public use. (Sts. & Hy. Code, § 8340.)

In addition, the abandonment statutes in plain terms authorize a legislative body to vacate "all or part" of any street. (Sts. & Hy. Code, § 8312.) The term " '[s]treet' " is defined to mean "all or part of, or any right in, a . . . public highway, road, street, . . . or easement, . . . and rights connected therewith, including, but not limited to, restrictions of access or abutters' rights, . . . or other incidents to a street or highway." (Sts. & Hy. Code, § 8308.) And the term " '[v]acation' " is defined as "the complete *or partial*

29

abandonment or termination of the public right to use a street, highway, or public service easement." (Sts. & Hy. Code, § 8309, italics added.) Based on the language of the abandonment statutes, we conclude that a government agency may abandon the public's right to use a road for general traffic purposes while simultaneously reserving an easement for public transit, public utility, and emergency services.

The facts of this case demonstrate why such partial abandonments are allowed. Aside from serving as an emergency access/transit connection to the Martis Camp community (and as the main access road for the Retreat subdivision), Mill Site Road was not planned or constructed for use by the public. (See discussion, part II, *ante*.) There is no reason for a member of the public to use the road except to visit a home in the Retreat. Under these circumstances, it is reasonable for the County to partially abandon the road, relinquishing the public's right to use the road for general vehicular traffic, while reserving the public's right to use the road for transit/emergency purposes.

Plaintiffs also object to the reservation of a private road easement for the benefit of the Retreat property owners.[22] Plaintiffs rely on a line of cases that have prohibited the partial closure of streets to some, but not all, members of the public. (See *Rumford v. City of Berkeley* (1982) 31 Cal.3d 545 (*Rumford*); *City of Lafayette v. County of Contra Costa* (1979) 91 Cal.App.3d 749 (*Lafayette*); *Citizens Against Gated Enclaves v. Whitley Heights Civic Assn.* (1994) 23 Cal.App.4th 812 (*Citizens*); see also *Sorrento, supra*, 118 Cal.App.4th at pp. 817-818.)

---

[22]     Contrary to what plaintiffs argue, the abandonment was not conditioned on granting Northstar staff access to Mill Site Road for ski lift operations and maintenance. This was a proposed condition at the time of the August 4, 2015 meeting, but it was dropped as a condition after the parties executed a private access agreement. We refuse to speculate whether the Board would have abandoned the road in the absence of the access agreement. Therefore, we reject plaintiffs' claim that the Board unlawfully conditioned approval on Northstar's continued access.

Plaintiffs' reliance on the *Rumford-Lafayette-Citizens* line of cases is misplaced. Each of those cases concerned whether a city has authority, under Vehicle Code section 21101, to partially close a street to vehicular traffic despite the city having failed to comply with the statutory requirements for closure. (*Rumford, supra*, 31 Cal.3d at pp. 551-554; *Lafayette, supra*, 91 Cal.App.3d at pp. 755-758; *Citizens, supra*, 23 Cal.App.4th at pp. 819-821.) The issue here, in contrast, involves a county's authority to abandon a public road easement under the Streets and Highways Code, where the county has followed the statutory requirements and made the necessary findings to support abandonment. (See *Citizens*, at p. 821 [distinguishing power to vacate or abandon streets upon a finding that the property is unnecessary].)

Although the County conditioned abandonment on reservation of a private easement for the Retreat property owners, the County was not using abandonment to "pick and choose" which members of the public can use the road. The Retreat and its property owners have interests over and above the general public because the Retreat homeowners association owns the road. Where, as here, a public entity abandons a public easement relating to property that the public did not own, the proffered easement reverts to or merges back into the title of the underlying fee owner.[23] (Sts. & Hy. Code, § 8351, subd. (a); see also *County of Inyo v. Given* (1920) 183 Cal. 415, 421.)

Here, it was reasonable for the County to ensure, as a condition of abandonment, that the owners of the lots would retain the legal right to use the roads to access their properties. We may question whether the condition was necessary, since the individual lot owners presumably acquired abutter's rights to use Mill Site Road and Cross Cut Court (*Clay v. City of Los Angeles* (1971) 21 Cal.App.3d 577, 581; Sts. & Hy. Code,

---

[23]    In this case, title reverted back to the fee owner free of the public easement, but subject to reservations for public transit/emergency access, et cetera.

§ 8353), but we find no support for plaintiffs' claim that the condition impermissibly discriminated between members of the public with the same right of access.

We also are not persuaded the Board violated the abandonment statutes in requiring an irrevocable offer of dedication by which the County could reacquire the public road easements in Mill Site Road under certain conditions. Citing *Ratchford, supra*, 22 Cal.App.3d 1056, plaintiffs argue that the condition shows the County may need to restore Mill Site Road to public use in the future, and that this is inconsistent with the County's finding that the road is unnecessary for prospective public use.

We find no inconsistency. Although the condition envisions the possibility that Mill Site Road could again become a public road, the condition says nothing about the present necessity of the road to the general public transportation network. If the County has the authority to reserve easements for public transit, utility, and emergency access services, as we conclude, then the County has the authority to impose a condition to ensure the property owner does not materially interfere with those easements.

The mere fact that the County has reserved an option to return Mill Site Road to public use does not preclude a finding that the road is unnecessary for present or prospective public use. (See *Sorrento, supra*, 118 Cal.App.4th at pp. 815-816.) Plaintiffs' reliance on *Ratchford* is misplaced, as that case did not involve the reservation of easements and conditions by the governing body. (*Ratchford, supra*, 22 Cal.App.3d at pp. 1059-1062, 1073-1077.)

D.    *Public interest*

The Board made numerous findings how abandonment of Mill Site Road will serve the public interest, including that abandonment will (1) ensure the existing roadway network matches what was analyzed and presented to the public in the planning documents for the MVCP and the Martis Camp and Retreat projects; (2) ensure roads are used consistently with the standards to which they were designed; (3) relieve the County of the burden of road and drainage maintenance; (4) improve traffic circulation within

32

Northstar; and (5) protect the County's investments in, and the integrity and successful operation of, the Northstar Traffic Management System. Plaintiffs argue the Board's findings are irrelevant because the findings improperly focus on whether Mill Site Road originally was intended to function as a public road, and ignore that Mill Site Road was, in fact, functioning as a public road. Not so.

Plaintiffs mischaracterize the Board's findings. The Board did not deny that Mill Site Road was a public road, or find that it was not intended to function as a public road. Rather, what the Board found is that Mill Site Road was never intended to be used as a means for Martis Camp residents to access their community. The Board's findings are obviously relevant because they directly address plaintiffs' claim that Mill Site Road is a necessary public road due to Martis Camp residents' use of the road as a shortcut between Martis Camp and Northstar.

Plaintiffs also claim the Board's findings are not supported by the evidence. Citing *Ratchford, supra*, 22 Cal.App.3d at pages 1075 through 1076, plaintiffs argue a street may not be vacated for exclusive private use. According to plaintiffs, "the . . . record evidence is clear" that the public did not benefit from the proposed abandonment and the "only beneficiaries" are the Retreat developers and its property owners. Plaintiffs' claim lacks merit.

In the absence of fraud or collusion, a determination by a government agency as to what constitutes the public interest is entitled to considerable deference. (*Heist, supra*, 163 Cal.App.3d at p. 849.) And the fact that persons owning property adjacent to the road requested its abandonment or will benefit from it does not, by itself, establish fraud or collusion. (*Ibid*.; see also *Kinney v. Overton* (2007) 153 Cal.App.4th 482, 495-496; *Constantine v. Sunnyvale* (1949) 91 Cal.App.2d 278, 282 [private owner may benefit if controlling purpose of street closure was public interest].)

*Heist* is instructive. In *Heist*, a primary purpose of the abandonment was to stop trespassing on privately owned lands that abutted the road. (*Heist, supra*, 163

33

Cal.App.3d at p. 844.) Although stopping the trespass undoubtedly benefitted the landowner, the court nevertheless upheld the county's findings that abandonment was in the public interest because abandonment conformed with the county general plan and relieved the county of the burden of maintaining the road. (*Id*. at p. 849.)

In this case, the Board similarly abandoned a public road in an attempt to stop unauthorized uses of that road. In support of the abandonment, the Board made findings that abandonment would benefit the public by conforming use of the road to planning and environmental documents, protecting the integrity of the traffic management system, and relieving the County of the burden of road and drainage maintenance. The Board's findings are supported by substantial evidence. Thus, we reject plaintiffs' challenges to the public interest findings.

IV

*Alleged CEQA Violations*

Plaintiffs contend that the County violated CEQA by (1) relying on an addendum to the Martis Camp EIR; (2) using an improper baseline to evaluate the impacts of abandoning Mill Site Road; and (3) failing to prepare a supplemental or subsequent EIR. We agree the County violated CEQA by relying on an addendum to the Martis Camp EIR and failing to evaluate whether the abandonment of Mill Site Road will require major revisions to that EIR.

A.   *Standard of review*

In CEQA cases, we independently review the administrative record to determine whether the agency abused its discretion. (*Ventura Foothill Neighbors v. County of Ventura* (2014) 232 Cal.App.4th 429, 434.) Abuse of discretion is shown if the agency has not proceeded in the manner required by law, or the determination is not supported by substantial evidence. (*Ibid*.)

In evaluating an EIR for compliance with CEQA, "a reviewing court must adjust its scrutiny to the nature of the alleged defect, depending on whether the claim is

34

predominantly one of improper procedure or a dispute over the facts." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435 (*Vineyard Area Citizens*).) Where the alleged defect is that the agency has failed to proceed in the manner required by law, we determine de novo whether the agency has employed the correct procedures, scrupulously enforcing all legislatively mandated requirements. (*Ibid*.)

Where the alleged defect is that the agency's factual conclusions are unsupported, we review for substantial evidence. (*Vineyard Area Citizens, supra*, 40 Cal.4th at p. 435.) In applying the substantial evidence test, we must indulge all reasonable inferences from the evidence that would support the agency's finding and resolve all conflicts in the evidence in favor of the agency's decision. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571.)

B.      *Addendum to Martis Camp EIR*

The County approved the abandonment of Mill Site Road based on an addendum to the Martis Camp EIR. The addendum considered whether abandoning Mill Site Road would create new or substantially more severe impacts as compared to the impacts identified in the Martis Camp EIR. The County approved the addendum after determining that no major revisions to the Martis Camp EIR were required because abandoning Mill Site Road would simply restore traffic patterns to those envisioned and analyzed in the Martis Camp EIR.

Plaintiffs contend that because Mill Site Road was not part of the Martis Camp project, the County erred in relying on the Martis Camp EIR. Plaintiffs argue the County should have considered the abandonment as a modification to the Retreat project and evaluated the impacts in relation to the Retreat EIR. Plaintiffs note that the County initially drafted an addendum to the Retreat EIR before deciding instead to prepare an addendum to the Martis Camp EIR.

35

Defendants contend the County properly focused its environmental review on the Martis Camp project, rather than the Retreat, because the sole effect of the abandonment was to alter traffic circulation patterns in the Martis Camp community, which was analyzed in the Martis Camp EIR.

We conclude that while the County's approach seems reasonable from the perspective of informed decisionmaking, it is nevertheless inconsistent with the requirements of CEQA. We explain below.

"At the 'heart of CEQA' [citation] is the requirement that public agencies prepare an EIR . . . . [Citations.]" (*Friends of College of San Mateo Gardens v. San Mateo County Community College Dist*. (2016) 1 Cal.5th 937, 944 (*San Mateo Gardens*).) "The purpose of the EIR is 'to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' [Citation.]" (*Ibid*.) "The EIR thus works to 'inform the public and its responsible officials of the environmental consequences of their decisions before they are made,' thereby protecting ' "not only the environment but also informed self-government." ' [Citations.]" (*Id*. at pp. 944-945, italics omitted.)

CEQA sets a low threshold for requiring the preparation of an EIR in the first instance. (*San Diego Navy Broadway Complex Coalition v. City of San Diego* (2010) 185 Cal.App.4th 924, 935 (*San Diego Navy*).) However, after an initial EIR is certified, there is a statutory presumption against additional environmental review. (*Ibid*.; § 21167.2.) Section 21166 prohibits agencies from requiring additional environmental review unless (1) substantial changes are proposed in the project that will require major revisions to the EIR; (2) substantial changes occur with respect to the circumstances under which the project is being undertaken that will require major revisions to the EIR; or (3) new information, which was not known and could not have been known when the

EIR was certified, becomes available. (§ 21166; CEQA Guidelines, § 15162.)[24] Section 21166 comes into play "precisely because in-depth review has already occurred." (*Bowman v. City of Petaluma* (1986) 185 Cal.App.3d 1065, 1073 (*Bowman*).) The question is whether circumstances "have *changed* enough to justify *repeating* a substantial portion of the process." (*Ibid*.)

---

[24] CEQA Guidelines section 15162 implements section 21166. It provides that when an EIR has been certified, no subsequent EIR shall be prepared unless the lead agency determines, based on substantial evidence in the light of the whole record, that:

"(1) Substantial changes are proposed in the project which will require major revisions of the previous EIR . . . due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects;

"(2) Substantial changes occur with respect to the circumstances under which the project is undertaken which will require major revisions of the previous EIR . . . due to the involvement of new significant, environmental effects or a substantial increase in the severity of previously identified significant effects; or

"(3) New information of substantial importance, which was not known and could not have been known with the exercise of reasonable diligence at the time the previous EIR was certified as complete . . . shows any of the following:

"(A) The project will have one or more significant effects not discussed in the previous EIR . . . ;

"(B) Significant effects previously examined will be substantially more severe than shown in the previous EIR;

"(C) Mitigation measures or alternatives previously found not to be feasible would in fact be feasible and would substantially reduce one or more significant effects of the project, but the project proponents decline to adopt the mitigation measure or alternative; or

"(D) Mitigation measures or alternatives which are considerably different from those analyzed in the previous EIR would substantially reduce one or more significant effects on the environment, but the project proponents decline to adopt the mitigation measure or alternative." (CEQA Guidelines, § 15162, subd. (a).)

If one of the conditions described in section 21166 applies, the lead agency must prepare either a subsequent EIR or a supplemental EIR. If major changes are required to make the previous EIR adequate, the agency must prepare a subsequent EIR. (*Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1199-1200.) If only minor additions or changes are necessary to make the original EIR adequate, the agency may prepare a supplement to the EIR. (*Id*. at p. 1200; see also CEQA Guidelines, § 15163, subd. (a).) An addendum to an EIR is appropriate to document an agency's determination that a subsequent EIR or a supplemental EIR is not required. (*San Mateo Gardens, supra*, 1 Cal.5th at p. 946; CEQA Guidelines, § 15164, subd. (a).)

But CEQA review is triggered only when a public agency makes a discretionary decision to approve or carry out a project. (§§ 21080, 21002.1, 21061; CEQA Guidelines, § 15357; *San Diego Navy, supra*, 185 Cal.App.4th at p. 933.) "Once a project has been approved, the lead agency's role in project approval is completed, unless further discretionary approval on that project is required." (CEQA Guidelines, § 15162, subd. (c); *San Diego Navy*, at p. 936; *Cucamongans United for Reasonable Expansion v. City of Rancho Cucamonga* (2000) 82 Cal.App.4th 473, 479 (*Cucamongans*).) Activities undertaken to implement a previously approved project do not trigger further environmental review. (*County of Santa Clara v. Redevelopment Agency* (1993) 18 Cal.App.4th 1008, 1017-1018.)

An agency approves a project when it commits the agency to a definite course of action in regard to a project intended to be carried out by any person. (CEQA Guidelines, § 15352, subd. (a).) The term " 'project' " refers to the action or activity approved by the agency. (CEQA Guidelines, § 15378, subd. (c).) A discretionary project is a project which requires the exercise of judgment or deliberation when the agency decides to approve or disapprove a particular activity, as distinguished from situations where the

public agency or body merely has to determine whether there has been conformity with applicable statutes, ordinances, or regulations.  (CEQA Guidelines, § 15357.)

In this case, the County construed the abandonment of Mill Site Road as a modification to the Martis Camp project.  This finding is not supported by substantial evidence.  Mill Site Road was not part of the Martis Camp project; it was part of the Retreat project.  Further, the stated effect of abandoning Mill Site Road was to prevent Martis Camp residents from using Mill Site Road for travel to/from the Martis Camp subdivision—a use which the Board found to be *prohibited* by the conditions of approval for that project.  There is no evidence to support the County's finding that the abandonment of Mill Site Road modified any part of the Martis Camp project approved in 2005.[25]

Even if the abandonment of Mill Site Road was not a change to the Martis Camp project, defendants argue it was a change in the circumstances surrounding that project.  Perhaps so, but the question of whether further environmental review is required for a project arises only when the public agency makes a further discretionary decision to carry out or approve *that project*.  (CEQA Guidelines, § 15162, subd. (c).)  If no further discretionary approvals are required, supplemental environmental review is not required, even if the circumstances surrounding the project change or important new information

---

[25]     We recognize that at some time between 2010 and 2011, residents began using the emergency access link and Mill Site Road as a secondary point of ingress/egress for the Martis Camp subdivision, and that the CDRA erroneously determined that such use did not violate the project conditions of approval.  In a separate appeal, we determined, in the context of a ruling on demurrer, that allegations the County approved such use stated a CEQA violation because such use constituted a substantial change in the project that could not be authorized without further environmental review.  (*Tahoe Residents, supra*, C075933.)  However, as part of the abandonment of Mill Site Road, the County overruled any prior determinations that private vehicles were allowed to use the emergency access connection.  As a result, we are not here faced with an allegation that the County substantially changed the project by *permitting* such use.

becomes available. (*Ibid*.; *Cucamongans, supra*, 82 Cal.App.4th at p. 479; *Fort Mojave Indian Tribe v. Department of Health Services* (1995) 38 Cal.App.4th 1574, 1597.) Here, because Mill Site Road was not part of the Martis Camp project, abandonment of the road did not require a further discretionary approval for the Martis Camp project.

CEQA generally limits the circumstances under which a lead agency may reuse an EIR originally prepared for a different project. (CEQA Guidelines, §§ 15006, subd. (f), 15084, subd. (d)(5), 15153, subd. (a).) Because the abandonment of Mill Site Road modified the Retreat project, we conclude the County should have looked to the Retreat EIR to determine whether the previous environmental document retains relevance in light of the proposed project modifications. (See *San Mateo Gardens, supra*, 1 Cal.5th at p. 944.)

We understand the practical desire to use the Martis Camp EIR, since the effect of the abandonment is simply to restore traffic patterns to those that were envisioned by the Martis Camp project and analyzed in its EIR. But we are not aware of any authority that allows an agency to conduct subsequent environmental review of a change to a project by relying on analysis from a prior EIR prepared for a different project.[26]

---

[26] We do not construe *San Mateo Gardens, supra*, 1 Cal.5th 937 as authorizing a lead agency to choose any prior environmental review as long as it has some "informational value." In *San Mateo Gardens*, the Supreme Court was discussing the issue of deciding when proposed changes to a project should be considered a new project, requiring a new EIR under section 21151, as opposed to changes to a previously approved project, subject to subsequent environmental review under section 21166. (*San Mateo Gardens*, at pp. 943-944.) The court held that when an agency proposes changes to a project, it must determine whether the previous environmental document retains relevance in light of the changes and, if so, whether major revisions to the previous environmental document nevertheless are required. (*Id*. at p. 944.) However, the court acknowledged that the subsequent review provisions apply only to a previously approved project that has been subject to environmental review; the provisions do not apply if the agency has proposed a new project not previously analyzed in the original environmental document. (*Id*. at pp. 949-950.) By parity of reasoning, we conclude the subsequent

40

The County's reliance on an addendum to the Martis Camp EIR was prejudicial. In deciding whether a failure to comply with CEQA is prejudicial error, courts do not determine whether the agency's ultimate decision would have been different if the law had been followed. They focus on whether the violation prevented informed decisionmaking or informed public participation. (§ 21005; *Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 485.) A failure to comply with mandatory procedures is presumptively prejudicial. (*Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1236; *Vineyard Area Citizens, supra*, 40 Cal.4th at p. 435 [we " 'scrupulously' enforc[e] all legislatively mandated CEQA requirements' "].) Here, prejudice is apparent because the County failed to consider whether the proposed abandonment will require major revisions to the Retreat EIR due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects.

C.       *The decision not to prepare a supplemental or subsequent EIR*

Plaintiffs argue the County also violated CEQA by preparing an addendum instead of a supplemental or subsequent EIR (SEIR). Plaintiffs contend an SEIR is required because abandonment of Mill Site Road will cause new and more severe environmental impacts by forcing Martis Camp residents to use SR 267 to reach Northstar, increasing vehicles miles traveled (VMT) and associated harmful emissions and pollutants.

As we have discussed, an SEIR is required under section 21166 where it is necessary to explore the environmental impacts of a substantial change not considered in the original EIR. (*River Valley Preservation Project v. Metropolitan Transit Development Bd.* (1995) 37 Cal.App.4th 154, 166-167.) If the impacts resulting from

---

review provisions do not apply when an agency approves changes to a different project subject to a different environmental document.

changes to the project do not differ significantly from those described in the prior EIR, an SEIR is not required. (*Bowman, supra*, 185 Cal.App.3d at pp. 1079-1081.)

Defendants argue that an SEIR was not required here because the traffic-related impacts that plaintiffs have identified (increase in VMT and air pollution) are not new; they were fully accounted for in the Martis Camp EIR. Defendants' argument is based on the legally flawed premise that the effects of abandoning Mill Site Road can be compared against the environmental impacts analyzed in the Martis Camp EIR. For the reasons discussed above, we disagree. Thus, we conclude the County prejudicially abused its discretion in concluding that no SEIR was required based on the Martis Camp EIR.[27]

D.      *The baseline determination*

Plaintiffs also argue that the addendum used an improper baseline to assess the proposed abandonment's environmental impacts.[28] Plaintiffs contend the baseline should have reflected the fact that on the date of the environmental analysis, Martis Camp residents were using Mill Site Road as a convenient path of travel between Martis Camp and Northstar.

Defendants contend, and we agree, that plaintiffs are conflating the rules governing initial review of a project under section 21151 with supplemental review under section 21166. (*Bowman, supra*, 185 Cal.App.3d at p. 1073; *Benton v. Board of*

---

[27]      Unlike the Martis Camp EIR, the Retreat EIR never analyzed the traffic-related impacts of Martis Camp vehicles traveling to/from Northstar via SR 267. It had no reason to since those trips were not direct or indirect impacts of the Retreat project. (§ 21061 [purpose of EIR is to provide public agencies and the public with information about the likely environmental effects of the proposed project].) But this does not necessarily mean the County would be required to prepare an SEIR, since there is nothing to suggest that the impacts from the modified project are any different from the original project analyzed in the Retreat EIR. We express no opinion here on this issue.

[28]      Our finding of CEQA violations on other issues does not relieve us from reviewing this contention. (§ 21005, subd. (c).)

42

*Supervisors* (1991) 226 Cal.App.3d 1467, 1477, fn. 10, disapproved on other grounds as stated in *San Mateo Gardens, supra*, 1 Cal.5th at p. 958, fn. 6.) "Whereas section 21151 requires an EIR if the project 'may have a significant effect on the environment,' section 21166 provides that an agency may not require preparation of another EIR unless 'substantial changes' in the project or its circumstances will require 'major revisions' to the EIR." (*Bowman*, at p. 1073, italics omitted.) When a lead agency is considering whether to prepare a subsequent EIR, the agency is specifically authorized to limit its consideration to effects not considered in connection with the earlier project. (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 543.)

Under *San Mateo Gardens*, an agency that proposes changes to a project must determine whether the previous environmental document for that project retains relevance despite changes to the project or its surrounding circumstances. (*San Mateo Gardens, supra*, 1 Cal.5th at pp. 944, 952-953.) This is a predominantly factual question for the agency to answer, subject to review for substantial evidence. (*Ibid*.)

Because we agree with plaintiffs that the County should have compared the effects of abandoning Mill Site Road against the environmental impacts analyzed in the Retreat EIR, rather than the Martis Camp EIR, it is premature to consider whether the County used an appropriate baseline to assess the proposed abandonment's environmental impacts. This matter must be remanded so the County may determine in the first instance whether the Retreat EIR retains relevance despite the changes to the project or its circumstances. If so, then the County may proceed to decide under CEQA's subsequent review provisions whether the changes require major revisions to the Retreat EIR due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects. (*San Mateo Gardens, supra*, 1 Cal.5th at pp. 944, 950, 952-953.) If the County instead determines that the proposed changes have rendered the Retreat EIR irrelevant to the decisionmaking process, then the

43

agency would have to start from the beginning by determining whether an EIR is required under section 21151. (*San Mateo Gardens*, at pp. 951, 952, fn. 3.)

V

*Dismissal of Inverse Condemnation Claim*

In their first amended petition and complaint, the Martis Camp Homeowners alleged that the County, by approving the abandonment, substantially impaired their abutter's rights to access Mill Site Road, thereby reducing the market value of their properties. Before the hearing on the merits, the trial court sustained without leave to amend a demurrer to the Martis Camp Homeowners' inverse condemnation claim on the ground the Martis Camp Homeowners, as nonabutting property owners, cannot allege a compensable taking of their property because their property does not directly abut Mill Site Road. Plaintiffs contend the trial court improperly dismissed the Martis Camp Homeowners' claim.

A.      *Background law*

It has long been recognized that an owner of property abutting upon a public street has a property right in the nature of a private easement in the street upon which the property abuts. (*Clay v. City of Los Angeles, supra*, 21 Cal.App.3d at p. 581.) The easement consists of the right to access the street upon which the landowner's property abuts and from there, in a reasonable manner, the general system of public streets. (*Friends of H Street v. City of Sacramento* (1993) 20 Cal.App.4th 152, 166-167.) This right cannot be taken or damaged for a public purpose without the payment of just compensation. (*Gianni v. San Diego* (1961) 194 Cal.App.2d 56, 60-61.) If the right of access enjoyed by an owner of property abutting a public street is substantially impaired by the closing or abandonment of a roadway, the owner is entitled to compensation. (*Leonard v. People ex rel. Dept. of Transportation* (1998) 62 Cal.App.4th 1296, 1299;

44

*Breidert v. Southern Pac. Co.* (1964) 61 Cal.2d 659, 663-664; *Constantine v. Sunnyvale, supra*, 91 Cal.App.2d at p. 284.)

B.      *Analysis*

We review an order sustaining a demurrer without leave to amend de novo, exercising our independent judgment to determine whether the complaint states facts sufficient to constitute a cause of action. (*Williams v. Housing Authority of Los Angeles* (2004) 121 Cal.App.4th 708, 718.) We accept the truth of material facts properly pleaded in the operative complaint, but not contentions, deductions, or conclusions of fact or law. (*Stansfield v. Starkey* (1990) 220 Cal.App.3d 59, 72.) We also may consider matters subject to judicial notice. (*Ibid.*) If the court sustained the demurrer without leave to amend, we also must decide whether there is a reasonable possibility the plaintiff could cure the defect. (*Ibid.*) Nevertheless, where the nature of the plaintiff's claim is clear, and no liability exists, a court should deny leave to amend because no amendment could change the result. (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 459.)

We review the correctness of the trial court's action in sustaining the demurrer, not the court's statement of reasons for its action. (*Stansfield v. Starkey, supra*, 220 Cal.App.3d at p. 72.) The burden is on the appellant to demonstrate that the trial court erred in sustaining the demurrer or abused its discretion in denying leave to amend. (*Coutin v. Lucas* (1990) 220 Cal.App.3d 1016, 1020.)

On appeal, the Martis Camp Homeowners concede that none of their lots—or any of the other Martis Camp homesites—directly abut Mill Site Road. Nevertheless, they claim to have abutter's rights because they were granted a nonexclusive easement for ingress and egress over all the subdivision's roads. We conclude the trial court correctly ruled that the Martis Camp Homeowners, as nonabutting landowners, cannot state a cause of action for inverse condemnation based on the alleged loss of abutter's rights in Mill Site Road.

The "operative question" in a takings claim based on an alleged loss of abutter's rights is whether the action substantially impaired the property owner's right of access to the general system of public streets. (*Brumer v. Los Angeles County Metropolitan Transportation Authority* (1995) 36 Cal.App.4th 1738, 1745; *Abar v. Rogers* (1972) 23 Cal.App.3d 506, 516.) It is the abutting property owner that has the right of access and can recover compensation when there has been a substantial impairment of that right. (*Brumer, supra*, at p. 1745.) A nonabutting property owner does not have any special right to damages merely because access to a conveniently located street has been denied. (*Symons v. San Francisco* (1897) 115 Cal. 555, 557-558; *Harding v. State of California ex rel. Dept. of Transportation* (1984) 159 Cal.App.3d 359, 364-365; see also *Holloway v. Purcell* (1950) 35 Cal.2d 220, 229-230 [abutting landowner not entitled to damages for diminution in value of land]; *Sierra Palms Homeowners Assn. v. Metro Gold Line Foothill Extension Construction Authority* (2018) 19 Cal.App.5th 1127, 1135 [homeowners association has authority to stand in shoes of property owners to bring a claim for damage to common areas]; but see *Kinney v. Overton, supra*, 153 Cal.App.4th at pp. 492-493 [abandonment of subdivision street in which owners held private easements].)

That the Martis Camp Homeowners, as nonabutting property owners, may have been granted a separate easement to use the subdivision's streets does not alter this result.[29] The abandonment of Mill Site Road did not interfere with the Martis Camp

---

[29] Plaintiffs' argument centers around the map for Martis Camp unit No. 7A, recorded in November 2008, which purports to grant each residential lot a "non-exclusive roadway easement for ingress and egress over the [emergency access easement] area at the east end of Schaffer Mill Road." The intent of this language is not entirely clear. The improvement plans for that portion of the project, recorded a few months earlier, clearly required the installation of electronic gates on the emergency access road, along with a traffic sign indicating that the road was restricted to emergency vehicle access only. Further, there is no evidence in the record that the County undertook any environmental

Homeowners' easement over the subdivision's streets or render their homesites inaccessible. Plaintiffs have not cited any authority to support their novel legal theory that nonabutting landowners may claim damages for interference with an abutting landowner's separate access rights merely because they have been granted a nonexclusive easement over that property. Accordingly, we affirm the dismissal of the Martis Camp Homeowners' inverse condemnation claim.

## DISPOSITION

We affirm the portion of the judgment and order concluding that the County did not violate the Brown Act or the statutory requirements for abandonment of a public road, and affirm the dismissal of the Martis Camp Homeowners' inverse condemnation claim, but conclude plaintiffs are entitled to relief on their CEQA claims. Thus, we reverse the judgment and order denying the petitions for writ of mandate and remand with directions to enter a new judgment and order granting the petitions and ordering issuance of a peremptory writ of mandate in accordance with the requirements of section 21168.9 and this opinion. Each party shall bear its own costs on appeal.. (Cal. Rules of Court, rule 8.278(a)(3), (5).)

                                              KRAUSE          , J.

We concur:

      BLEASE          , Acting P. J.

      DUARTE          , J.

---

review of the impacts associated with the grant of the easement. For these reasons, we have doubts whether the language was intended to authorize residents to use the emergency access area for anything other than emergency ingress and egress. Nevertheless, we do not attempt to resolve that issue here.